**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br>**v.**<br>**TAHMIR PENA BLAYLOCK** | **CRIMINAL NO. 26-083** |

# MEMORANDUM OPINION

**Rufe, J.** **October 26, 2026**

Defendant Tahmir Pena Blaylock is charged in a four-count indictment with one count of possession with intent to distribute controlled substances in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C), one count of possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A), and two counts of possession of a firearm by a felon in violation of 18 U.S.C. § 922(g)(1). Now before the Court is Defendant's motion to suppress the recovered firearm, ammunition, holster, controlled substances, and cash, as well as any statements made by Defendant subsequent to the initial seizure of his person. Upon consideration of Defendant's motion, the government's response thereto, and the evidence, exhibits, testimony, and oral argument presented at the hearing held on September 30, 2026, the Court now enters its findings of fact and conclusions of law.

## I. FINDINGS OF FACT[1]

1. On April 24, 2025, Philadelphia Police Department Officer Donte Givens was working the 6:00 PM to 2:00 AM shift at the headquarters of Philadelphia's 16th Police District,

[1] The following factual findings are based on evidence presented at the suppression hearing of September 30, 2026, including testimony of Philadelphia Police Department Officers, the officers' body-worn camera ("BWC") footage, and Real-Time Crime Camera footage.

located at 39th Street and Lancaster Avenue.[2] Officer Givens had roughly ten years of experience as a police officer at the time of the arrest and was assigned to the "Five Squad," a tactical unit within the 16th District.[3]

2. Shortly after beginning his shift, Officer Givens logged into his computer and accessed Real-Time Crime Cameras ("RTCCs"), a "city-based camera system," for which Officer Givens was "specifically trained," with cameras "strategically located across the city to . . . have a bird's-eye view of crime going on in certain areas."[4]

3. Officer Givens checked the RTCC located at 41st Street and Lancaster Avenue at approximately 6:30 PM and initially observed and focused on "numerous males standing on the corner."[5]

4. At 6:35 PM, Officer Givens's attention was drawn to Defendant, who was not among the individuals he had previously been observing, because he saw that Defendant's "front hoodie pocket was heavily weighted down."[6] At the time, Defendant was engaged in a conversation with an unidentified woman.[7]

5. Officer Givens began zooming the RTCC in on Defendant's front sweatshirt pocket, where he observed an object with an "L shape upside down," which he "believed to be

---

[2] Suppression Hr'g Tr. ("Hr'g Tr.") 9–11, 14.

[3] *Id.* at 10–11.

[4] *Id.* at 14.

[5] *Id.*; Gov't Ex. G-1A, RTCC Footage ("RTCC"), at 18:29:39.

[6] Hr'g Tr. 15; RTCC, at 18:35:20.

[7] RTCC, at 18:35:20.

consistent with a firearm."[8] Specifically, Officer Givens saw what he believed to be the imprint of the barrel and handle of a firearm in Defendant's sweatshirt pocket.[9]

6. After watching Defendant on the RTCC for several minutes, Officer Givens brought over his colleague, Officer Brian Canela.[10] At the time of the arrest, Officer Canela had roughly ten years of experience as a police officer and was also assigned to the 16th District's tactical unit.[11]

7. Officer Givens asked Officer Canela "to look at the video as well to see what he thought . . . [Defendant] had in his front hoodie pocket."[12] Officer Givens testified that he did not reveal to Officer Canela what he thought was in Defendant's pocket.[13] Upon watching the RTCC video, Officer Canela told Officer Givens that "he felt as though [Defendant] had a firearm in his hoodie pocket as well."[14] Specifically, Officer Canela saw an "L shaped bulge" and what he believed to be the barrel and handle of a firearm.[15]

8. According to Officer Canela, in his experience, individuals who keep a gun in their front sweatshirt pocket, which is not "a safe way to carry a firearm," are often carrying that firearm unlawfully without a license.[16]

---

[8] Hr'g Tr. 15; RTCC, at 18:35:20–42:19.

[9] Hr'g Tr. 19.

[10] *Id.* at 27. Canela was promoted to the rank of sergeant this past year. *Id.* at 62. However, because Canela was an officer at the time of the arrest at issue, *id.*, this Opinion refers to him as "Officer Canela."

[11] *Id.* at 62–63.

[12] *Id.* at 27; *see id.* at 65.

[13] *Id.* at 27.

[14] *Id.* at 29; *see id.* at 65.

[15] *Id.* at 65, 68.

[16] *Id.* at 68.

9. Upon seeing the large object that they believed to be a potentially unlicensed firearm in Defendant's sweatshirt pocket on the RTCC, Officers Givens and Canela decided to drive over to Defendant's location to investigate further and conduct an encounter to determine "whether he was licensed to have a firearm."[17] Officers Givens and Canela drove to Defendant's location in separate marked police vehicles, without lights and sirens on, alongside their respective partners, Officers Sowell and Manasrah.[18]

10. At 6:42 PM, Officers Givens and Sowell arrived at the area where Defendant was standing, but they were unable to pull over next to him because they were blocked by a trolley driving in the opposite direction.[19] Officers Givens and Sowell thus made a U-turn at the intersection of 41st Street and Lancaster Avenue to get on the same side of the street as Defendant.[20]

11. While Officers Givens and Sowell were making their U-turn, Officers Canela and Manasrah were "a few car lengths" behind them.[21] At that time, Officer Canela observed Defendant "looking towards Officer Givens' patrol vehicle . . . putting his hands inside of his front hoodie pocket and walking towards a vehicle that was parked in the parking lane and trying to open the passenger door."[22]

---

[17] *Id.* at 29, 79.

[18] *Id.* at 29, 69.

[19] *Id.* at 34; *see* RTCC, at 18:42:33–41; Gov't Ex. G-2, Officer Givens BWC Footage ("Givens BWC"), at 18:42:38–41.

[20] Hr'g Tr. 34; *see* RTCC, at 18:42:41–52; Givens BWC, at 18:42:41–52.

[21] Hr'g Tr. 70.

[22] *Id.* at 71.

12. Officer Canela then "went to go park in front of the vehicle that [Defendant] was trying to open,"[23] at which point Defendant "looked at [Officer Canela] . . . reached into his front hoodie pocket, turned his body away from [Officer Canela], [and] lowered down."[24]

13. As Officer Canela was exiting his vehicle, Defendant "crouched down to obscure [Officer Canela's] view [of] him, and . . . began crouch running westbound on Lancaster [Avenue]."[25]

14. Upon exiting his vehicle, Officer Canela observed Defendant, still crouching down, with a firearm "in his right hand."[26]

15. Defendant then went toward a sewer drain and "began stuffing the firearm inside the sewer" in an effort to conceal it.[27]

16. Officer Canela ordered Defendant to "drop the gun," but Defendant did not respond.[28]

17. As Defendant was placing his right hand with the firearm into the sewer drain, Officer Canela ran toward him, eventually made contact with him, and held him to the ground.[29]

18. While Officers Canela and Manasrah were holding Defendant down, they realized that Defendant's hand was stuck in the sewer drain, and Officer Canela worked to pull it out.[30]

---

[23] *Id.*; Gov't Ex. G-3, Officer Canela BWC Footage ("Canela BWC"), at 18:42:44–50.

[24] Hr'g Tr. 71.

[25] *Id.*

[26] *Id.* at 72; *see* Canela BWC, at 18:42:54.

[27] Hr'g Tr. 72; *see* Canela BWC, at 18:42:54–56.

[28] Hr'g Tr. 73.

[29] Canela BWC, at 18:42:54–58; Hr'g Tr. 74.

[30] Hr'g Tr. 74; Canela BWC, at 18:42:58–43:26.

At that time, Officer Canela had safety concerns because if Defendant "came out of the sewer with a firearm he could hurt, injure, [or] kill [Officer Canela] or anybody else out there."[31]

19. Officers Givens and Sowell parked and exited their vehicle, observed Officers Canela and Manasrah restraining Defendant on the ground, and ran over to assist.[32]

20. As the officers secured Defendant and attempted to remove Defendant's hand from the sewer drain, an officer asked Officer Canela, "Did he [Defendant] put it [the firearm] down there [in the sewer]?" Officer Canela replied, "Yeah."[33]

21. With Defendant's hand still in the sewer drain, Officer Givens was concerned that Defendant continued to hold the firearm, so he told Defendant that he was going to tase him.[34] In response, Defendant said, "I don't have it [the firearm]. It's down there [in the sewer]."[35]

22. Officer Canela then said to Defendant, "If you come out with that [expletive] gun in your hand," to which Defendant responded, "It's not in my hand. It's not in my hand. It's down there [in the sewer]."[36]

23. While the officers were holding Defendant on the ground and attempting to remove his hand from the sewer drain, Officer Manasrah searched Defendant and retrieved from his front waistband a gray firearm holster, which was attached to his belt.[37]

---

[31] Hr'g Tr. 74.

[32] Hr'g Tr. 35; Givens BWC, at 18:42:55–59.

[33] Canela BWC, at 18:43:06–07.

[34] Hr'g Tr. 36; Givens BWC, at 18:43:09–10.

[35] Givens BWC, at 18:43:10–12.

[36] Canela BWC, at 18:43:19–25.

[37] Hr'g Tr. 36–37, 74–75; *see* Givens BWC, at 18:43:14–16.

24. Eventually, the officers removed Defendant's hand from the sewer drain.[38] Immediately upon removing Defendant's hand from the sewer drain, the officers began handcuffing him.[39] While Defendant briefly attempted to sit back up and stiffen his arms, the officers ultimately handcuffed him successfully and placed him under arrest.[40]

25. Once Defendant was handcuffed and arrested, the officers placed him in Officers Canela and Manasrah's police vehicle.[41] The officers then "conduct[ed] a search incident to arrest and located narcotics on [Defendant's] person."[42] Soon thereafter, the officers determined Defendant's identity and found that he did not have a license to carry a firearm.[43]

26. Later, the firearm that Defendant had discarded was recovered from the sewer by the Philadelphia Police Department's Marine Unit.[44] Once Officer Givens had the retrieved firearm, he found that the holster obtained from Defendant during the stop "was specifically made for the same firearm that we recovered from the sewer."[45] When Officer Givens "physically inserted the firearm into the holster," it "was a smooth fit."[46]

---

[38] Canela BWC, at 18:43:25–27.

[39] *Id.* at 18:43:27–35.

[40] *Id.* at 18:43:35–43; Hr'g Tr. 75–76.

[41] Hr'g Tr. 78.

[42] *Id.*

[43] *Id.* at 79.

[44] *Id.* at 37.

[45] *Id.*

[46] *Id.*

## II. Discussion

### A. Initial Stop

The Fourth Amendment guarantees the right to be free from "unreasonable searches and seizures."[47] "Generally, for a seizure to be reasonable under the Fourth Amendment, it must be effectuated with a warrant based on probable cause."[48] However, the Supreme Court's decision in *Terry v. Ohio*[49] established an exception to the warrant requirement, under which "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot."[50] While "the level of suspicion required for a *Terry* stop is obviously less demanding than that for probable cause," an officer "must be able to articulate something more than an inchoate and unparticularized suspicion or 'hunch.'"[51] The officer must have "'some minimal level of objective justification' for making the stop."[52] Moreover, in determining whether reasonable suspicion existed, courts must consider the "totality of the circumstances—the whole picture."[53] Evidence obtained from an investigatory stop that does not meet the requirements of reasonable suspicion or from an arrest that does not meet the requirements of probable cause "must be suppressed as 'fruit of the poisonous tree.'"[54]

---

[47] U.S. Const. amend. IV.

[48] *United States v. Robertson*, 305 F.3d 164, 167 (3d Cir. 2002) (citing *Katz v. United States*, 389 U.S. 347, 356–57 (1967)).

[49] 392 U.S. 1 (1968).

[50] *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Terry*, 392 U.S. at 30).

[51] *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (citation modified) (quoting *Terry*, 392 U.S. at 27).

[52] *Id.* (quoting *INS v. Delgado*, 466 U.S. 210, 217 (1984)).

[53] *Robertson*, 305 F.3d at 167 (quoting *Sokolow*, 490 U.S. at 8).

[54] *United States v. Brown*, 448 F.3d 239, 244 (3d Cir. 2006) (quoting *Wong Sun v. United States*, 371 U.S. 471, 487–88 (1963)).

The government argues that the officers had reasonable suspicion to believe that Defendant was carrying a firearm without a license in violation of Pennsylvania law.[55] Specifically, the government contends that five factors, taken in their totality, gave rise to reasonable suspicion: (1) Defendant's presence in a "high-crime" area; (2) the officers' observation of a heavy object in Defendant's front pocket with the possible imprint of a firearm outline; (3) upon noticing Officer Givens's marked police vehicle, Defendant's attempt to open a nearby vehicle's door and then a hide a portion of his body from view; (4) Defendant's crouching and running with a suspected firearm in his right hand when Officer Canela exited his vehicle; and (5) Defendant's placing of his hand in a sewer drain and discarding of the firearm into the sewer.[56]

Defendant disagrees. First, Defendant urges the Court not to factor into its analysis the government's assertion that Defendant was present in an alleged "high-crime area," arguing that the government has failed to present sufficient particularized data to support such a claim.[57] Second, Defendant contends that the fact that he appeared to have an object in the front pocket of his sweatshirt does not, on its own, establish reasonable suspicion.[58] Third, Defendant notes that even if the officers had clearly seen that he had a firearm, they had no way of knowing at the time of the stop whether or not he was a lawful gun owner.[59] Fourth and finally, Defendant

[55] Gov't Opp'n Def.'s Mot. Suppress Physical Evid. & Statements ("Gov't Opp'n") 15–18 [Doc. No. 26]; *see* 18 Pa. Cons. Stat. § 6108.

[56] Gov't Opp'n 16–18.

[57] Mem. L. Supp. Def.'s Mot. Suppress ("Def.'s Mot.") 7–10 [Doc. No. 22].

[58] *Id.* at 10.

[59] *Id.* at 11–12.

challenges the credibility of Officers Givens and Canela's testimony regarding their observations and actions prior to and during the stop and subsequent arrest.[60]

The Court agrees with the government. In the totality of the circumstances, the facts support a reasonable suspicion that Defendant was unlawfully carrying an unlicensed firearm such that an investigatory stop was justified. As an initial matter, the Court finds the testimony of Officers Givens and Canela credible, as their assertions are supported by the RTCC and BWC footage. The bulk of the evidence giving rise to reasonable suspicion was captured on the BWC and RTCC footage, so exclusive reliance on the officers' testimony is unnecessary in the first place. Furthermore, the Court need not decide whether Defendant's presence in an alleged "high-crime area" is a relevant factor in the reasonable suspicion analysis for this case. Nor does the Court need to decide whether the appearance of a large object in an individual's pocket, *standing alone*, establishes reasonable suspicion. That is so because, setting aside Defendant's presence in an alleged "high-crime area," the large object in Defendant's sweatshirt pocket *alongside* Defendant's actions upon the arrival of the officers were enough, *in their totality*, to support a reasonable suspicion that criminal activity was afoot.

When Officers Givens and Canela saw the large object in Defendant's sweatshirt pocket, they drove over to him to attempt a voluntary encounter to gather further information,[61] something they were free to seek out just as Defendant would have been free to refuse.[62] But when Defendant saw the officers approaching—with the large object still in his sweatshirt

[60] Hr'g Tr. 91–97.

[61] *Id.* at 29, 79.

[62] *See Florida v. Bostick*, 501 U.S. 429, 434 (1991) ("Our cases make it clear that a seizure does not occur simply because a police officer approaches an individual and asks a few questions. So long as a reasonable person would feel free 'to disregard the police and go about his business,' the encounter is consensual and no reasonable suspicion is required. The encounter will not trigger Fourth Amendment scrutiny unless it loses its consensual nature." (citation omitted) (quoting *California v. Hodari D.*, 499 U.S. 621, 628 (1991)).

pocket—he quickly attempted to open a nearby vehicle's door, hid his body from the officers, crouched down, ran, held a firearm in his right hand, and jammed his hand into a sewer drain, seemingly to discard the firearm.[63] In their totality, these actions were sufficient to give rise to a reasonable suspicion that Defendant was carrying a firearm unlawfully and, more broadly, that criminal activity was afoot. All these actions occurred *before* the initial stop. Thus, by the time Officer Canela made contact with Defendant, he and his fellow officers had developed a reasonable suspicion of criminal activity, making their stop of Defendant permissible under the Fourth Amendment. Therefore, the evidence that the officers obtained during the stop—namely, the holster and certain statements made by Defendant—need not be suppressed.[64]

### B. Probable Cause

The Fourth Amendment "permits an officer to arrest a suspect without a warrant if there is probable cause to believe that the suspect has committed or is committing an offense."[65] "'[P]robable cause' to justify an arrest means facts and circumstances within [an] officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense."[66] As with reasonable suspicion, the probable cause analysis requires

---

[63] Hr'g Tr. 71–72; *see* Canela BWC, at 18:42:54–56.

[64] Defendant's only argument for suppressing the holster and his statements is that they were "fruit of the poisonous tree" of an unlawful seizure. Def.'s Mot. 4, 10. Because the Court finds that the initial stop was lawful, the Court further holds that the holster and Defendant's statements during that stop need not be suppressed as fruit of the poisonous tree. The Court thus does not reach any other potential arguments not briefed by the parties regarding the statements or the scope of the search. The Court notes, however, that the holster was recovered as part of a permissible search of Defendant's clothing for possible weapons during a lawful investigatory stop. *See Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993) ("If a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons.").

[65] *Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979).

[66] *Id.* at 37.

courts to consider the totality of the circumstances.[67] Furthermore, because "[a] custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment . . . , a search incident to the arrest requires no additional justification."[68]

Defendant argues that the officers lacked probable cause to arrest him for the same reasons he claimed they lacked reasonable suspicion for the initial stop.[69] The government counters that probable cause existed based on the same factors that established reasonable suspicion alongside Defendant's actual discarding of the firearm into the sewer and the statements he made during the initial stop.[70] The Court again agrees with the government.[71]

As noted, by the time of the initial stop, the officers had observed Defendant carrying a large object in his front sweatshirt pocket that formed the shape of a firearm, then attempting to open a vehicle door upon noticing the officers, hiding his body, crouching, running, holding a firearm in his hand, and placing his hand into a sewer drain.[72] Then, during the initial stop but before Defendant was handcuffed, the following events occurred. First, Defendant discarded the firearm into the sewer.[73] Defendant also made two statements. In response to Officer Givens saying he was going to tase Defendant because he was concerned that Defendant was still holding the firearm, Defendant said, "I don't have it [the firearm]. It's down there [in the

---

[67] *Illinois v. Gates*, 462 U.S. 213, 230–31 (1983).

[68] *United States v. Robinson*, 414 U.S. 218, 235 (1973).

[69] Def.'s Mot. 11–12.

[70] Gov't Opp'n 19–20.

[71] In analyzing probable cause in this case, the Court discusses further evidence obtained by the officers after Officer Canela first made contact with Defendant and before Defendant was handcuffed. The Court does so because the Court holds that this initial contact was part of a lawful investigatory stop and that Defendant was not arrested—at which point probable cause was necessary under the Fourth Amendment—until he was handcuffed. However, for the avoidance of doubt, the Court finds that even if Defendant was arrested for purposes of the Fourth Amendment when Officer Canela first made contact with him, the officers already had probable cause at that time—for the same reasons that gave rise to reasonable suspicion—to justify the arrest.

[72] Hr'g Tr. 34, 71–72; RTCC, at 18:35:20–42:19; Canela BWC, at 18:42:54–56.

[73] *See* Hr'g Tr. 35–37, 74–75; Canela BWC, at 18:42:56–43:27.

sewer].”[74] When Officer Canela then said to Defendant, “If you come out with that [expletive] gun in your hand,” Defendant responded, “It’s not in my hand. It’s not in my hand. It’s down there [in the sewer].”[75] At the same time, while searching Defendant, Officer Manasrah recovered from Defendant’s waistband a firearm holster in which Defendant had not been securely carrying the firearm.[76]

The circumstances of Defendant’s actions and the officers’ observations thereof, both prior to and during the initial stop, were, in their totality, “sufficient to warrant a prudent person . . . in believing” that Defendant was unlawfully carrying a firearm without a license.[77] Thus, the officers then had probable cause to believe that Defendant had committed a crime and were justified in arresting him. Moreover, once the officers had sufficient probable cause to arrest Defendant, they were likewise permitted to conduct a search incident to arrest.[78] Therefore, the objects that the officers recovered from Defendant upon his arrest—including the alleged narcotics, cash, firearm, and ammunition—need not be suppressed.[79]

## III. Conclusions of Law

1. The officers had reasonable, articulable, and individualized suspicion to conduct the initial stop based on their observations of Defendant carrying a large object in his front sweatshirt pocket, attempting to open a parked car upon noticing the officers, hiding his body,

---

[74] Givens BWC, at 18:43:10–12.

[75] Canela BWC, at 18:43:19–25.

[76] Givens BWC, at 18:43:14–16; Hr’g Tr. 36–37, 74–75.

[77] *DeFillippo*, 443 U.S. at 36.

[78] *See Robinson*, 414 U.S. at 235.

[79] As with the evidence obtained during the initial stop, Defendant’s only argument for suppressing the evidence collected upon his arrest is that they were “fruit of the poisonous tree” of an unlawful seizure. Def.’s Mot. 4, 12. Because the Court finds that the arrest and subsequent search incident to arrest were lawful, the Court further holds that the evidence recovered from that search need not be suppressed as fruit of the poisonous tree. The Court thus does not reach any other potential arguments not briefed by the parties regarding the scope of the search.

crouching, running, holding a firearm in his hand, and placing the hand with which he was holding the firearm into a sewer drain.

2. The officers had probable cause sufficient to arrest Defendant and conduct a search incident to arrest based on their observations of the facts that established reasonable suspicion alongside the statements Defendant made during the initial stop, the holster recovered by Officer Manasrah, and Defendant's actual discarding of the firearm into the sewer in an effort to conceal it.

## IV. CONCLUSION

For the reasons set out above, Defendant's motion to suppress will be denied. An order will follow.